IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RALPH BLAKNEY, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | NO.  10-4237 |
| | : | |
| THE CITY OF PHILADELPHIA, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM**

BUCKWALTER, S. J.                                                                                           September 22, 2011

Presently before the Court is the Motion for Summary Judgment by Defendant the City of Philadelphia ("Defendant" or "the City") on the Complaint of Plaintiff Ralph Blakney ("Plaintiff"). For the following reasons, the Motion is granted.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiff Ralph Blakney, an African-American resident of Philadelphia, joined the City of Philadelphia's Department of Recreation in 1988 as a director of one of the Department's six older adult centers. (Pl.'s Resp. Opp'n, Ex. A, Dep. of Ralph Blakney, 7:15-16, Apr. 19, 2011 ("Blakney Dep.").) Plaintiff's initial post was a civil service position, which required applicants to pass a civil service examination administered through the City's Personnel Department. (Pl.'s Statement of Facts ¶ 7.) On November 13, 2000, Plaintiff was appointed to the position of Executive Director of the Mayor's Office of Community Services ("MOCS"). (Def.'s Mot. Summ. J., Ex. 8.) He was granted a leave of absence from his position as Center Director to serve as Executive Director, but continued to accumulate seniority during his tenure at MOCS.

(Pl.'s Statement of Facts ¶ 10; Def.'s Mem. Supp. Mot. Summ. J 7.)  Plaintiff remained at MOCS from 2000-2008.  (Blakney Dep. 8:5-8.)  While at MOCS, Plaintiff oversaw the agency's 300 employees and $50 million budget.  (Id. at 18:14-19.)

Plaintiff's position at MOCS ended in January of 2008.  (Id. at 32:23.)  At that time, the City had openings for a Center Director at the South Philadelphia Older Adult Care Center ("the South Philadelphia Center") and the Mann Older Adult Center ("the Mann Center").  (Pl.'s Statement of Facts ¶ 11.)  Plaintiff requested that he be assigned to the South Philadelphia Center, the larger of the two centers.  (Id.; Def.'s Mem. Supp. Mot. Summ. J. 7.)  Despite this request, Ms. Lynn Spiro, Older Adult Services Director, gave the position to Lynn Marshall, a white female.  (Pl.'s Statement of Facts ¶ 21; Pl.'s Resp. Opp'n, Ex. C, Dep. of Lynn Spiro, 16:3-18:23, June 3, 2011 ("Spiro Dep.").)  While the position would have only been a lateral transfer for Plaintiff, it was a promotion for Ms. Marshall.  (Spiro Dep. 19:15-20.)  Ms. Spiro assigned Plaintiff to the Mann Center, citing the department's operational needs.  (Def.'s Mem. Supp. Mot. Summ. J. 7.)  The Mann Center served a primarily Latino client base.  (Pl.'s Statement of Facts ¶ 20.)  Plaintiff describes his time at the Mann Center as difficult, stating that he did not feel accepted by the community because they clearly desired a Latino director.  (Blakney Dep. 63:9-65:6.)  At some point during his tenure at the Mann Center, his car was vandalized.  (Id. at 63:24.)

Soon after returning to the Recreation Department, Plaintiff asked Bill Carapucci, acting Recreation Commissioner, if there were any positions available as a deputy commissioner.  (Pl.'s Statement of Facts ¶ 30.)  Mr. Carapucci directed Plaintiff's inquiry to Ms. Celia O'Leary,

director of the Office of Human Resources[1] ("OHR"). (Id.) Ms. O'Leary's staff reviewed Plaintiff's resume and sent Plaintiff an e-mail listing vacant middle-to-upper management positions in which he might be interested. (Def.'s Mot. Summ. J., Ex. 12.) Based on this list, Plaintiff applied for the position of Recreation Program Director on January 25, 2008. (Pl.'s Resp. Opp'n, Ex. B, Dep. of Celia O'Leary, 20:13-24, June 10, 2011 ("O'Leary Dep.").) The duties of a Program Director included "directing, through subordinate district managers, a major segment of the City's overall recreation program. Employees in this class develop, evaluate, modify, and implement a wide variety of athletic, sports, and cultural recreation programs." (Def.'s Mot. Summ. J., Ex. 15.) The position was two promotional steps above Plaintiff's position as Center Director. (Def.'s Mem. Supp. Mot. Summ. J. 10.) Thus, Plaintiff was required to pass a promotional examination administered by OHR. (Id. at 8, 10.) The position of Program Director required "[t]hree years of supervisory recreation experience directing through subordinate supervisors, either the operation of all recreation facilities within an assigned district or the provision of comprehensive social service, nutrition and recreation programs in City-administered older adult centers." (Def.'s Mot. Summ. J., Ex. 15.) Mr. Chris Orji, an analyst from OHR, spoke with Plaintiff, reviewed his credentials, and deemed him eligible to sit for the exam based on his experience at MOCS. (Pl.'s Statement of Facts ¶¶ 33-34.)

Plaintiff passed the exam for the position of Program Director in February of 2008. (Pl.'s Statement of Facts ¶ 36; Def.'s Mot. Summ. J., Ex. 14.) He was the only African-American to do so. (Pl.'s Statement of Facts ¶ 36.) After the exam was scored, OHR ranked applicants

---

[1] The Office of Human Resources administers promotional examinations and maintains eligibility tests. (Def.'s Mem. Supp. Mot. Summ. J. 8.)

according to their score and placed them on a list of eligible candidates. (Def.'s Mot. Summ. J., Ex. 9, Civ. Serv. Reg. 9.067; Ex. 10, Civ. Serv. Reg. 10.01.) Pursuant to City regulations, only the two highest-ranking individuals could be interviewed for the position. (Id., Ex. 29, Civ Serv. Reg. 11.03.) Plaintiff ranked third out of four applicants placed on the eligibility list. (Id., Ex. 17.) Lisa-Anne Kenny, a white Recreation District Manager, ranked fourth. (Id.; Pl.'s Statement of Facts ¶ 36.)

On March 19, 2008, Kenny and nine other white District Managers sent Ms. O'Leary a letter conveying their concern that a Center Director was permitted to take the promotional exam for Program Director. (Def.'s Mot. Summ. J., Ex. 18; Pl.'s Statement of Facts ¶ 37.) The letter cited nineteen areas of concern, including the significant difference in supervisory responsibilities between the two positions, and a Center Director's lack of experience in running sports and recreation programs and maintaining recreation facilities. (Def.'s Mot. Summ. J., Ex. 18.) Ms. Kenny also informed OHR that because Plaintiff did not serve in the intermediate position of Services Director, he had no experience overseeing large-scale recreation events such as the annual Elder Olympics. (Def.'s Mem. Supp. Mot. Summ. J. 11.)

After receiving these various complaints, Glenn Harper, an executive assistant from the Personnel Department, reviewed Plaintiff's certification and concluded that Mr. Orji had erred in approving him to sit for the examination. (Id. at 12; Def.'s Mot. Summ. J., Ex. 20.) Generally, candidates are only removed from the eligibility list where their analyst made a mistake in certifying their initial application or where the candidate is later found to have falsified his credentials. (O'Leary Dep. 18:23-19:13.) If an analyst is believed to have erred in qualifying a candidate to take the exam, their evaluation is typically reviewed by a supervisor or team leader.

(Id. at 19:17-20:4.) The Director of OHR must then disqualify the candidate if he is found to lack the requisite qualifications. (Def.'s Mot. Summ. J., Ex. 11, Civ. Serv. Reg. 8.023-1.) Candidates removed from the list "may make a written request to the Director for the restoration of his or her name to such list." (Id., Ex. 10, Civ. Serv. Reg. 10.10.)

Upon reviewing Plaintiff's certification, Mr. Harper found that Mr. Orji erred in concluding that Plaintiff gained experience in supervising and implementing recreation or service programs for older adults during his tenure at MOCS. (Id., Ex. 20.) This assessment was subsequently approved on April 16, 2008 by Ms. Heather McCaffrey, Hiring Services Manager. (Id., Ex. 21.)[2] As a result, Plaintiff's name was removed from the eligibility list, disqualifying him from applying for the position. (Id.) Ultimately, the position was filled by Terri Kerwawich, a white female ranking first on the list. (Pl.'s Statement of Facts ¶ 51; Def.'s Mot. Summ. J., Ex. 17.) Plaintiff chose not to appeal his removal based on an unsuccessful appeal from his removal from another eligibility list in 1999. (Pl.'s Statement of Facts ¶ 49.) Instead, he filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). (Id.) Plaintiff now alleges that the City of Philadelphia, in conjunction with the Recreation Department, removed him from the list on the basis of his race. (Id. ¶ 52.)

Plaintiff remained Center Director for the Mann Center until December 3, 2008. (Def.'s Mem. Supp. Mot. Summ. J. 15.) He was then assigned to the King Older Adult Center, where he remained until his resignation on January 4, 2011. (Id.) While working at the King Center,

---

[2] Ms. McCaffrey's letter to Plaintiff stated that the qualifications for the position "describe[d] experience gained as an Older Adult *Services* Director, not as an Older Adult Center Director, which is the position you hold. . . . MOCS is not recreation experience and the executive director's position was not supervising a comprehensive program of services to older adults." (Id.)

5

Plaintiff alleges he was harassed by his supervisor, Services Director Lynn Spiro. (Pl.'s Statement of Facts ¶ 59.) Plaintiff contends that Spiro undermined him by communicating directly with his staff, ignoring his requests for help and supplies, and refusing to speak to him. (Id. ¶ 60.)

Plaintiff now asserts that Defendant's refusal to place him at the South Philadelphia Center and removal of his name from the eligibility list for Program Director were motivated by racial animus. He further claims that the City subjected him to a hostile work environment during his time at the King Center. He commenced this action on August 20, 2010, alleging violations of Title VII (Count I), 42 U.S.C. § 1981 (Count II), and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. C.S.A. §§ 951-963 (Count III). (Compl. ¶¶ 36-58.) Defendant filed a Motion for Summary Judgment on July 1, 2011, and Plaintiff filed a Response in Opposition on July 29, 2011. The Court now considers Defendant's Motion.

## II.  STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). It is not the court's role to weigh the

disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.

     Although the moving party bears the initial burden of showing an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims."  Id. at 325.  Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586.  "[T]he non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006).  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate.  Celotex, 477 U.S. at 322.  Moreover, the mere existence of some evidence in support of the nonmovant will not be adequate to support a denial of a motion for

summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmovant on that issue. Anderson, 477 U.S. at 249-50.

**III.   DISCUSSION**

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "To succeed on a Title VII or § 1981 claim of race discrimination, a claimant must establish that he was the subject of purposeful discrimination." Robinson v. Home Depot, Inc., No. CIV.A.06-935, 2009 WL 2960990, at *15 (D.N.J. Sept. 11, 2009) (citing Weldon v. Kraft, 896 F.2d 793, 796 (3d Cir. 1990)).[3] Where, as here, the plaintiff does not present direct evidence of discrimination, courts apply the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999) (citing McDonnell Douglas, 411 U.S. at 802). Under the McDonnell Douglas scheme, plaintiffs alleging race-based employment discrimination must first establish a prima facie case by showing: (1) they are members of a protected class; (2) they are qualified for the position; (3) they suffered an adverse employment action; and (4) that the action occurred under circumstances that give rise to an inference of unlawful discrimination,

---

[3] Plaintiff argues that because Defendant's Motion fails to address his § 1981 claim, his allegations are deemed admitted. (Pl.'s Resp. Opp'n 15.) The elements of a § 1981 claim, however, are identical to those for a claim of employment discrimination under Title VII. Schurr v. Resorts Int'l Hotel Inc., 196 F.3d 486, 499 (3d Cir. 1999). Thus, "the Court uses the same analysis in assessing the substantive merit of the claims." Robinson, 2009 WL 2960990, at *14. Likewise, "[c]laims brought under the PHRA are analyzed under the same standards that have evolved under Title VII." Harley v. McCoach, 928 F. Supp. 533, 538 (E.D. Pa. 1996) (citations omitted). Accordingly, the Court finds that Defendant's arguments apply to all three of Plaintiff's claims.

such as when a similarly-situated person not of the protected class is treated differently. Id. at 410-11.

If the plaintiff succeeds in establishing a prima facie case, the burden then shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the adverse employment action. Id. at 410. The burden on the defendant at this juncture is "relatively light," and the defendant can satisfy it "by introducing evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision." Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." Id. Once the defendant articulates such reasons, the burden reverts back to plaintiff, who must show by a preponderance of the evidence that those legitimate reasons were a pretext for discrimination. Id.

Defendant moves for summary judgment based upon Plaintiff's failure to (1) establish a prima facie case of discrimination with respect to the City's refusal to assign him to his preferred work location, as such an assignment does not constitute an "adverse employment action"; (2) offer evidence sufficient for the Court to question Defendant's legitimate, non-discriminatory reason for denying Plaintiff his preference and removing his name from the promotion list; or (3) set forth sufficient allegations that the City subjected him to a hostile work environment. (Def.'s Mem. Supp. Mot. Summ. J. 22-36.) The Court considers these arguments in turn.

> **A.    Whether Defendant's Failure to Grant Plaintiff His Preference for Center Assignment Constitutes an "Adverse Employment Action"**

An "adverse employment action" is one that is "serious and tangible enough to alter an

employee's compensation, terms, conditions, or privileges of employment." Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001) (quoting Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997)). Plaintiff argues that the City's improper disregard for his seniority in placing him at the Mann Center constitutes an adverse action. He notes that South Philadelphia was the larger of the two centers, and states that he never felt accepted at the Mann Center because its members were largely Spanish-speaking and thus desired a Latino director. (Pl.'s Statement of Facts ¶ 11; Blakney Dep. 63:9-65:6.) At some point during his tenure, his car was vandalized. (Id. at 63:24.)

Although an employment action may still be "adverse" even if there is no change in compensation,[4] Plaintiff has failed to show how Defendant's refusal to accede to his preference for placement at the South Philadelphia Center caused any serious change in the conditions or privileges of his employment. Although Defendant did not grant Plaintiff his preference in Centers, he admits that he had no power to dictate his placement. (Blakney Dep. 36:3-6.) Moreover, he identifies no difference between the two positions with regard to compensation, duties, prestige, or work schedule. He similarly fails to pinpoint any qualitative difference in the geographic location of the two centers. Indeed, the only difference he lists between the two sites is that the South Philadelphia Center would have offered "more peace of mind." (Id. at 63:9-14.) Such evidence is insufficient for a factfinder to infer that Plaintiff's assignment was adverse. Accordingly, with respect to Defendant's refusal to accede to Plaintiff's preference in work assignments, Plaintiff's claims fail. As a result, the Court need not consider Defendant's

---

[4] See, e.g., Tavana v. La Salle Univ., No. CIV.A.06-4376, 2007 WL 4105376, at *6 (E.D. Pa. Nov. 14, 2007).

proffered non-discriminatory reason for placing Plaintiff at the Mann Center.

    **B.    <u>Whether Defendant's Removal of Plaintiff from the Promotion List was Discriminatory</u>**

Defendant next argues that Plaintiff's lack of experience in supervising recreation programs for older adults constitutes a legitimate, non-discriminatory reason for the City's removal of Plaintiff from the list of eligible applicants for Program Director. (Def.'s Mem. Supp. Mot. Summ. J. 27-30.) Plaintiff responds that such an explanation is merely pretext for the City's true discriminatory motive, as his experience objectively qualified him for the position. (Pl.'s Resp. Opp'n 21-24.) He further argues that Defendant did not follow proper protocol in de-certifying his eligibility, (id. at 22), and states that Bill Carapucci, acting Recreation Commissioner at the time of the events in question, has admitted that Plaintiff was qualified for the position. (Id. at 19.)

To defeat a motion for summary judgment where a defendant has offered a legitimate, non-discriminatory reason for an adverse employment action, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764. "[T]he plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Id. at 765. "Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons

for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence' . . . ." Id. (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992)).

The Court finds Plaintiff's evidence insufficient to render Defendant's explanation "unworthy of credence." As an initial matter, Plaintiff has mischaracterized Mr. Carapucci's deposition testimony as to Plaintiff's qualifications. In response to the question of whether he would have hired Blakney as Deputy Commissioner, Carapucci stated, "I would have given the guy a discussion. I was always open to people, everybody, and I knew Ralph. I would have talked to Ralph." (Pl.'s Resp. Opp'n, Ex. D, Dep. of William Carapucci, 17:21-25, June 13, 2011 ("Carapucci Dep.").) Such statements hardly constitute an admission that Plaintiff met the published qualifications for the position of Program Director. Indeed, Mr. Carapucci made clear he was unfamiliar with the prerequisites of the Program Director position. When later asked whether Mr. Blakney was qualified to take the promotion exam, he responded, "Again, I don't know the details of what's qualifications [sic] for the particular area, so that's up to central personnel." (Id. at 21:2-6.) He went on to emphasize repeatedly that he had no power to hire Plaintiff for the position in question. (Id. at 14:21-24; 17:3-5, 11-17; 29:13-15.) Even taking Mr. Carapucci's statements in the light most favorable to Plaintiff, this evidence indicates, at most, that he knew Plaintiff and would have considered speaking with him had he been eligible for promotion. Such statements fail to highlight any inconsistencies or weaknesses in the manner in which OHR evaluated Plaintiff's credentials.

Similarly, the Court finds that Plaintiff's work experience and education do not render him so plainly qualified for the position as to suggest pretext on the part of the City. First, Plaintiff does not dispute that his experience as an Older Adult Center Director did not qualify

him to be a Program Director. Indeed, nothing in the record indicates that his duties as Center Director included the large-scale operation of recreational programs and facilities typically performed by his supervisors, the Recreation Services Directors. Rather, Plaintiff suggests he was eligible to skip an entire promotional level to Program Director due to his eight years of experience at MOCS. (Pl.'s Statement of Facts ¶ 12; Pl.'s Resp. Opp'n 19.) While the Court acknowledges that Plaintiff likely gained marketable experience at MOCS, Plaintiff's evidence fails to undercut Defendant's conclusion that such experience was inapplicable to the position in question.

      The published qualifications for the position of Program Director require three years of experience directing, via subordinates, "the operation of all recreation facilities within an assigned district or the provision of comprehensive social service, nutrition and recreation programs in City-administered older adult centers." (Def.'s Mot. Summ. J., Ex 15.) Such qualifications emphasize the importance of specific recreation experience, which Plaintiff has not demonstrated. Plaintiff describes the mission of MOCS as aiding low income residents in achieving self-sufficiency by funding and overseeing various social service programs and initiatives. (Blakney Dep. 15:22-16:6.) When asked to specifically identify any experience supervising recreational programs, he was unable to do so, stating that recreation was merely inherent in various programs he oversaw: "And I'm saying to you that inherent in practically every program where you are having people engage each other, if the program is going to be comprehensive, you have to take recreation into consideration if you are talking about the development of a person." (<u>Id.</u> at 27:1-6.) The Court, however, struggles to glean from the evidence what, if any, supervisory role Plaintiff had in the operation of the City's social service

13

programs, recreation or otherwise. While Plaintiff indicated that he was responsible for various programs – including the West Oak Lane Senior Center – he failed to clearly describe any role he had in the operation of such programs. (Id. at 23:15-20.) He merely stated that he "oversaw" the distribution of grant money from MOCS to the Recreation Center. (Id. at 28:2-21.)

The Court finds Plaintiff's vague description of his duties at MOCS insufficient to show he was objectively qualified for the Program Director position. Likewise, Plaintiff's master's degree in social work does not automatically qualify him to supervise the daily operation of multiple recreation facilities and programs.[5] Instead, Plaintiff offers only his own subjective view as evidence that he was qualified for the Program Director promotion. To demonstrate that an employer's articulated reason is merely pretext, "the plaintiff must show, not simply that the defendant's articulated business reason was wrong, 'but that it was so plainly wrong that it cannot have been the employer's real reason.'" Dumann v. Equitable Res., Inc., No. CIV.A.05-1113, 2006 WL 2794551, at *10 (W.D. Pa. Sept. 27, 2006) (quoting Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997)). "'The fact that a court may think that the employer misjudged the qualifications of the applicant does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination.'" Ezold, 983 F.2d at 531 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450

---

[5] Plaintiff also claims that Defendant's emphasis on his lack of "sports supervisory experience" is a "recent fabrication," as it was not previously identified as a prerequisite to the position. (Pl.'s Resp. Opp'n 23.) The published qualifications for the position, however, explicitly require "supervisory recreation experience." (See Def.'s Mot. Summ. J., Ex. 15.) Indeed, the letter explaining Plaintiff's de-certification listed this lack of recreation experience as the primary reason for his disqualification. (Id., Ex. 21.) The Court sees no distinction between the terms "sports" and "recreation," beyond the fact that "recreation" encompasses sporting activities. Moreover, Plaintiff fails to clarify how any difference in these terms might impact the outcome of this case. Thus, the Court shall consider the terms interchangeable.

U.S. 248, 259 (1981)). "It does not, however, always prove the employer's reason is 'unworthy of credence' in and of itself." Id. Evidence establishing such incredibility must show that the standard or criterion the employer relied on was "obviously weak or implausible." Villanueva v. Wellesley Coll., 930 F.2d 124, 131 (1st Cir. 1991). Here, even accepting Plaintiff's opinion as true, the evidence suggests, at most, that the City was incorrect in its evaluation – not that its conclusion was so implausible as to raise questions of discriminatory animus.

Moreover, Plaintiff fails to demonstrate that Defendant treated similarly-situated white employees differently. With regard to the employees ultimately chosen for the position, Plaintiff merely argues that they did not hold a master's degree. (Pl.'s Statement of Facts ¶ 51.) He goes on to contend that the City freely promoted white employees with fewer credentials. His only example, however, is Ms. Spiro, who began as a Center Director and is now a Services Director. (Id. ¶¶ 12, 48.) Although Plaintiff maintains that Ms. Spiro began working as Center Director after Plaintiff, he never indicates that she was chosen over him for the position of Services Director. Similarly, he fails to suggest that Spiro was not qualified for the position, which, unlike that of Program Director, was only one promotional level above Center Director. (See Def.'s Mem. Supp. Mot. Summ. J. 10.) Such evidence fails to demonstrate widespread discrimination on the part of the City.

### C. Whether Defendant's Failure to Follow Protocol in Disqualifying Plaintiff from Contention for the Program Director Position Indicates Racial Animus

Plaintiff next argues that the City's failure to follow protocol in removing his name from the eligibility list suggests discriminatory intent. He contends that the City's consideration of complaints by Ms. Kenny and other District Managers was improper because only an "appointing

authority" may formally object to a name on an eligibility list. (Pl.'s Resp. Opp'n 22.) As the Director of OHR noted in her deposition, however, eligibility lists are public documents – thus, "presumably anyone" could express an informal objection. (O'Leary Dep. 45:14-20.) The Court sees no impropriety in the City's audit of Plaintiff's credentials after receiving a letter from District Recreation Managers explaining why a Center Director would not be qualified for the position of Program Director. Even if such consideration was improper, Plaintiff does not clarify how such an act demonstrates discriminatory motives on the part of the City, aside from the fact that the signators of the letter were white. Similarly, while Ms. Kenny clearly had a personal interest in having Plaintiff disqualified so as to increase her own rank on the eligibility list, Plaintiff offers no evidence, aside from the fact that Ms. Kenney was white, that she was motivated by racial prejudice.

  Plaintiff further argues that the City improperly allowed Mr. Harper, an executive assistant in OHR, to investigate Plaintiff's certification. (Pl.'s Statement of Facts ¶ 41; Pl.'s Resp. Opp'n 22.) According to Plaintiff, Ms. O'Leary testified that an analyst's immediate supervisor – in this case, the supervisor of Mr. Orji – would typically review certifications thought to be erroneous. (Id.) Plaintiff, however, identifies no formal rule dictating who should perform the investigation. Furthermore, Ms. O'Leary averred that Ms. Heather McCaffrey, the Hiring Services Manager who approved Harper's assessment, was experienced in hiring analysis. (O'Leary Dep. 43:10-13.) Thus, the Court finds that Defendant's failure to have Mr. Orji's immediate supervisor audit Plaintiff's certification does not indicate any racial animus on the part of the City.

  In sum, apart from Plaintiff's own belief that his work experience qualified him for the

position of Program Director, he offers no evidence that the City's decision was incorrect, let alone motivated by discriminatory animus. Accordingly, Plaintiff has failed to render Defendant's legitimate, non-discriminatory motive for his removal from the eligibility list "unworthy of credence."

### D.     Whether Defendant Created a Hostile Work Environment

To establish a *prima facie* case for hostile work environment, Plaintiff must show: "'(1) he suffered intentional discrimination because of his [race]; (2) the discrimination was pervasive and regular; (3) it detrimentally affected him; (4) it would have detrimentally affected a reasonable person of the same protected class in his position; and (5) there is a basis for vicarious liability.'" Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005) (quoting Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2001)). In determining whether an environment is hostile or abusive, the court looks to all of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

Plaintiff claims that harassment by his supervisor, Lynn Spiro, created a hostile work environment during his tenure at the King Center. (Pl.'s Statement of Facts ¶ 59.) Plaintiff, however, does not identify any race-based comments or other discriminatory acts by Spiro. Indeed, Plaintiff offers little detail of the alleged harassment at all. He states that Spiro would "undermine Blakney by communicating directly with his staff, ignoring his requests for help and supplies, even refusing to speak to him." (Id. ¶ 60.) She also purportedly refused to address maintenance and security issues that Plaintiff brought to her attention. (Id. ¶ 61.) The Court

finds such evidence insufficient for a reasonable factfinder to infer that Plaintiff suffered pervasive discrimination. Likewise, he has not offered any evidence that the purported harassment he suffered at the hands of Ms. Spiro was racially-motivated. Accordingly, to the extent Plaintiff relies upon allegations of a hostile work environment, his claims fail.

## IV. CONCLUSION

In light of the foregoing, the Court finds that Plaintiff has failed to raise a genuine issue of material fact as to whether Defendant placed Plaintiff at the Mann Center and disqualified him from interviewing for the position of Program Director with discriminatory intent. At most, Plaintiff presents evidence that the City's evaluation of his credentials was wrong. Such evidence is insufficient for a fact-finder to infer that the City's actions were race-based. Similarly, the Court finds that Plaintiff has not established a prima facie case that he was subject to a hostile work environment. Accordingly, Defendant's Motion for Summary Judgment is granted and this case is closed.

An appropriate Order follows.